**FARRAND OPTICAL CO., Inc., Plaintiff-Appellant,**

v.

**The UNITED STATES of America, Defendant-Appellant.**

No. 314, Docket 27333.

United States Court of Appeals Second Circuit.

Argued June 5, 1962.

Decided Oct. 19, 1962.

On Petition for Rehearing in Banc in No. 263, Docket 27333.

March 27, 1963.

---

Waterman, Circuit Judge, dissented.

Pennie, Edmonds, Morton, Barrows & Taylor, New York City (Willis H. Taylor, Jr., John T. Farley, New York City, of counsel), for plaintiff-appellant.

Robert M. Morgenthau, U. S. Atty., S.D.N.Y. (David R. Hyde, David Klingsberg, Robert E. Kushner, Asst. U. S. Attys., of counsel), for defendant-appellant.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

WATERMAN, Circuit Judge.

The Invention Secrecy Act of 1951, 35 U.S.C. §§ 181–188, authorizes the Commissioner of Patents to delay the grant of a patent on an invention the disclosure of which might be detrimental to the national security. When he believes such a danger to exist, the Commissioner is directed to "make the application for patent in which such invention is disclosed available for inspection" to certain officials of designated defense agencies of the United States. At the request of any of these officials a secrecy order may issue withholding the grant of a patent for as long a period of time as the national interest requires.

An inventor whose patent has been so withheld is prevented from exploiting his invention, for he may not disclose it to other persons as long as the secrecy order is in effect. Moreover, defense agencies of the United States to whom, pursuant to § 181, the invention has been disclosed by the Commissioner of Patents, may use it, prior to the issuance of a patent, secure from the threat of an infringement action brought against the United States under 28 U.S.C. § 1498. Gearon v. United States, 115 F.Supp. 910, 126 Ct.Cl. 548 (1953), cert. denied, 348 U.S. 942, 75 S.Ct. 364, 99 L. Ed. 737 (1955). However, the inventor is not wholly deprived of the fruits of his discovery, ingenuity, and labor. Section 183 of the Act provides that he may apply to the agency responsible for the issuance of the secrecy order for "compensation for the damage caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure." If a satisfactory settlement with the agency cannot be effected, the claimant then may bring suit for this compensation against

the United States in the Court of Claims or in the United States District Court for the district where the claimant resides. 35 U.S.C. § 183; Robinson v. United States, 236 F.2d 24 (2 Cir., 1956).

The one question that we find it necessary to decide upon this appeal is whether the Invention Secrecy Act only applies to claims for compensation for unauthorized governmental use prior to the issuance of a patent and resulting from the disclosure envisioned in § 181 of the Act or whether the Act applies more broadly so as to encompass all claims for governmental use of an invention upon which a secrecy order has been imposed.

Plaintiff below, the Farrand Optical Co., Inc., (hereinafter called Farrand) is a manufacturer of scientific and industrial optical instruments. Established during the Second World War with governmental assistance, the company's primary work during the period of hostilities was in the design and production of bomb sights or fire control equipment for the armed forces. In the latter part of 1943, plaintiff's president, Clair Farrand, and its chief engineer, Robert W. Tripp, learned that the Air Force was urgently seeking a new type of gun sight for the B-29 bomber. A sight was desired that would scan through a lateral hemisphere and would furnish azimuth and elevation information in polar coordinates for use in directing fire from the nose of the plane. No fire control device then known was capable of doing this. Tripp promptly set to work to solve the difficult optical problems involved in the creation of such a device. By April 1944, a "mock-up" of his proposed new type "hemisphere sight" was ready for demonstration to officials of the Air Force. Their reaction to Tripp's invention was a favorable one. Various problems remained, however, with respect to the most practical optical and mechanical design arrangement for the new sight.

After extended negotiations, Farrand, on March 10, 1945, entered into a research and development contract with the War Department with a view to the solution of these problems. Article 30 of that contract, relating to "Reproduction and License Rights," gave to the Government a "non-exclusive irrevocable and royalty free right and license" to all discoveries made or first reduced to practice by Farrand in the performance of the contract. As to patent or other rights already owned by Farrand at the commencement of the contract the Government was granted only a royalty free license "limited in term to the duration of hostilities in any war in which the Government is now engaged plus six (6) months thereafter."

During the period from 1945 to 1950, work continued on the perfection and preparation for manufacture of the hemisphere sight. By the latter part of 1947, however, the Air Force determined that Farrand would not be able to supply all the needs of the Government for the device. The Air Force thus suggested, with Farrand's concurrence, that the Eastman Kodak Co. should be established as a second source of supply. Thereafter, Farrand and Eastman Kodak cooperated in the exchange of designs and other engineering information.

On August 19, 1946, Robert W. Tripp filed an application for a patent on the hemisphere sight in the United States Patent Office. The application was assigned to Farrand. In December 1948, Farrand was notified by the Patent Office that twenty-two claims had been allowed on Tripp's invention. Shortly thereafter, Farrand notified the Commissioner of Patents that the subject matter of the patent application was also the subject matter of certain Air Force contracts, the terms of which prohibited the disclosure that would occur if a patent was issued. The issuance of a secrecy order under the Invention Security Act was requested. On February 23, 1949, at the direction of the United States Air Force, a secrecy order was issued. The order remained in effect until December 2, 1954, after which, on October 4, 1955, a patent was granted on the Tripp application.

During the period 1950 through November 1, 1960, the Government pur-

chased from Farrand at a cost of some twenty-five million dollars a quantity of hemisphere gun sights involving elements of the Tripp invention. During the same period the Government purchased some 1646 hemisphere sights from the Eastman Kodak Company, at a cost totaling in excess of forty million dollars. In addition, spare parts for the sights costing some five million dollars were purchased by the Government from Eastman Kodak.

On May 5, 1955, Farrand brought suit in the United States District Court for the Southern District of New York seeking compensation for the Government's use of the Tripp invention, under 35 U.S.C. § 183, and for the Government's use and disclosure of the invention, under 22 U.S.C. § 1758. The claim under 22 U.S.C. § 1758 was subsequently dismissed with plaintiff's consent. In this suit Farrand sought compensation for all sights and used parts involving the Tripp invention purchased by the Government from Eastman Kodak. After a denial of the United States' motion to dismiss for failure to state a claim and for lack of jurisdiction, Farrand Optical Co. v. United States, 133 F.Supp. 555 (S.D.N.Y.1955), and a separate trial on the issue of liability, 175 F.Supp. 230 (S.D.N.Y.1959), the court below awarded judgment for the plaintiff in the amount of $657,622.17. 197 F.Supp. 756 (S.D. N.Y.1961). This award included compensation for all sights and all parts involving the Tripp invention, purchased by the Government from Eastman Kodak during the period from 1950, when manufacture began, to November 1, 1960, the commencement of the proceedings upon the issue of damages. From that judgment both plaintiff and defendant appeal, the plaintiff claiming that the award is inadequate and the defendant claiming, *inter alia*, that the district court improperly assumed jurisdiction of the issue.

In adjudging the plaintiff entitled to compensation under 35 U.S.C. § 183, the district court ruled that the Government's use of the Tripp invention, being based upon an implied contract to pay reasonable royalties, was lawful. The court stated: "The past contractual relations between the parties, as well as those which followed the joint endeavor between plaintiff and Eastman Kodak negate the theory of a tortious taking by the defendant. Plaintiff's claim here is for payment of just compensation for lawful use, not for compensation for unauthorized use, as for a tort. Title 28, § 1498." 175 F.Supp. 230, 247. The United States now argues on appeal that inasmuch as there had been no "unauthorized use" or tortious taking, the plaintiff's claim is not one for compensation under the Invention Secrecy Act and thus the district court had no jurisdiction over the case. The Government maintains that plaintiff's loss of royalties was not a result of the secrecy order or the statutorily required disclosure of the Tripp patent application to the Government, but, instead, was a result of contractual negotiations conducted long prior thereto and before Tripp filed the application for the issuance of a patent. Plaintiff's claim for a compensatory award, it is argued, is based upon an implied contract and thus, being for an amount in excess of $10,000, lies within the exclusive jurisdiction of the Court of Claims under 28 U.S.C. § 1491; see 28 U.S.C. § 1346. We hold with the Government, and as the court below had no jurisdiction over plaintiff's claim for compensation we do not discuss the other errors alleged in the parties' cross appeals.

Whether the compensation provisions of the Invention Secrecy Act apply only to unauthorized governmental use during the pendency of secrecy orders, or apply both to unauthorized and authorized use, depends, in our view, upon the proper construction of the disclosure provision of § 183 of the Act.[1] That section gives the "applicant * * * whose patent is

---

1. The pertinent provisions of 35 U.S.C. § 183 are as follows:

"§ 183. Right to compensation

"An applicant, his successors, assigns, or legal representatives, whose patent is withheld as herein provided, shall have

withheld as herein provided" the right to "compensation for damage caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure."

Section 181 of the Act [2] provides for two kinds of disclosure to which the § 183 phrase "use of the invention * * * resulting from his disclosure" may reasonably relate. The first is the applicant's disclosure of the invention in his patent application: "the Commissioner * * * shall make the application for patent in which such invention is disclosed avail-

the right, beginning at the date the applicant is notified that, except for such order, his application is otherwise in condition for allowance, or February 1, 1952, whichever is later, and ending six years after a patent is issued thereon, to apply to the head of any department or agency who caused the order to be issued for compensation for the damage caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure. The right to compensation for use shall begin on the date of the first use of the invention by the Government. The head of the department or agency is authorized, upon the presentation of a claim, to enter into an agreement with the applicant, his successors, assigns, or legal representatives, in full settlement for the damage and/or use. This settlement agreement shall be conclusive for all purposes notwithstanding any other provision of law to the contrary. If full settlement of the claim cannot be effected, the head of the department or agency may award and pay to such applicant, his successors, assigns, or legal representatives, a sum not exceeding 75 per centum of the sum which the head of the department or agency considers just compensation for the damage and/or use. A claimant may bring suit against the United States in the Court of Claims or in the District Court of the United States for the district in which such claimant is a resident for an amount which when added to the award shall constitute just compensation for the damage and/or use of the invention by the Government."

2. The pertinent provisions of 35 U.S.C. § 181 are as follows:

"§ 181. Secrecy of certain inventions and withholding of patent

* * * * *

"Whenever the publication or disclosure of an invention by the granting of a patent, in which the Government does not have a property interest, might, in the opinion of the Commissioner, be detrimental to the national security, he shall make the application for patent in which such invention is disclosed available for inspection to the Atomic Energy Commission, the Secretary of Defense, and the chief officer of any other department or agency of the Government designated by the President as a defense agency of the United States.

"Each individual to whom the application is disclosed shall sign a dated acknowledgment thereof, which acknowledgment shall be entered in the file of the application. If, in the opinion of the Atomic Energy Commission, the Secretary of a Defense Department, or the chief officer of another department or agency so designated, the publication or disclosure of the invention by the granting of a patent therefor would be detrimental to the national security, the Atomic Energy Commission, the Secretary of a Defense Department, or such other chief officer shall notify the Commissioner and the Commissioner shall order that the invention be kept secret and shall withhold the grant of a patent for such period as the national interest requires, and notify the applicant thereof. Upon proper showing by the head of the department or agency who caused the secrecy order to be issued that the examination of the application might jeopardize the national interest, the Commissioner shall thereupon maintain the application in a sealed condition and notify the applicant thereof. The owner of an application which has been placed under a secrecy order shall have a right to appeal from the order to the Secretary of Commerce under rules prescribed by him.

"An invention shall not be ordered kept secret and the grant of a patent withheld for a period of more than one year. The Commissioner shall renew the order at the end thereof, or at the end of any renewal period, for additional periods of one year upon notification by the head of the department or the chief officer of the agency who caused the order to be issued that an affirmative determination has been made that the national interest continues so to require. An order in effect, or issued, during a time when the United States is at war, shall remain in effect for the duration of hostilities and one year following cessation of hostilities. An order in effect, or issued, during a national emergency declared by the Pres-

able * * *." The second is the disclosure by the Commissioner of Patents of the filed patent application to officers of designated defense agencies: "Each individual to whom the application is disclosed shall sign a dated acknowledgment thereof * * *." The two sections may be read together, therefore, to provide special relief for an inventor whose patent has been withheld and whose only other control over the fruits of his discovery, the right to disclose his unpatented invention to potential users, has been preempted by the Commissioner of Patents pursuant to the provisions of § 181. If the sections are read together in this way the Government's unauthorized use of the invention for which compensation is provided must have directly resulted from the secrecy order and the steps leading to its issuance under § 181 of the Act.

However, this is not the only possible reading of the Act. The plaintiff earnestly contends, and the court below held, that inasmuch as the Act speaks only of use by the Government, and not specifically of unauthorized use, it can be interpreted broadly enough to cover cases, like the present, where compensation is sought for Government use pursuant to an express or implied license, follow-

ed, quite incidentally, by a subsequent secrecy order.

The legislative history of the Act is so meager that it casts little light on the true intent of Congress. The present statute, 35 U.S.C. §§ 181–88, enacted July 19, 1952, is substantially identical to its predecessor, 66 Stat. 4, former 35 U.S.C. §§ 151–159. Both statutes differ significantly from the earlier provision dealing with the same subject matter, an act of July 1, 1940, 54 Stat. 710, and its predecessor statute, an act of October 6, 1917, 40 Stat. 394. Throughout this forty-five year history, only one statement of Congressional intent appears clearly relevant to the present issue. The report of the House Committee on Patents, H.R. No. 96, 65th Cong. 1st Sess. (1917) stated:

"The bill provides also for compensation to an inventor whose device or invention is taken over by the Government and he is thus prevented from having the benefits which otherwise he might have derived from his invention." (at p. 1)

Early interpretations of the 1917 Act [3] by the Court of Claims reflect fundamental disagreement concerning the intent of Congress. In Zeidler v. United States, 61 Ct.Cl. 537 (1926), cert. denied, 273

---

ident shall remain in effect for the duration of the national emergency and six months thereafter. The Commissioner may rescind any order upon notification by the heads of the departments and the chief officers of the agencies who caused the order to be issued that the publication or disclosure of the invention is no longer deemed detrimental to the national security."

3. In its entirety, an act of October 6, 1917, 40 Stat. 394, provided as follows:

"That whenever during a time when the United States is at war the publication of an invention by the granting of a patent might, in the opinion of the Commissioner of Patents, be detrimental to the public safety or defense or might assist the enemy or endanger the successful prosecution of the war he may order that the invention be kept secret and withhold the grant of a patent until the termination of the war: *Provided*, That

the invention disclosed in the application for said patent may be held abandoned upon it being established before or by the commissioner that in violation of said order said invention has been published or that an application for a patent therefor has been filed in a foreign country by the inventor or his assigns or legal representatives, without the consent or approval of the Commissioner of Patents, or under a license of the Secretary of Commerce as provided by law.

"When an applicant whose patent is withheld as herein provided and who faithfully obeys the order of the Commissioner of Patents above referred to shall tender his invention to the Government of the United States for its use, he shall, if and when he ultimately received a patent, have the right to sue for compensation in the Court of Claims, such right to compensation to begin from the date of the use of the invention by the Government."

U.S. 724, 47 S.Ct. 236, 71 L.Ed. 860, the court, relying upon a requirement of *tender* in the 1917 Act, stated that the "measure was obviously not intended to hold the Government responsible for the use of a patented device in the absence of an express or implied contract to pay for such use." Id. at 553. This interpretation rendered the Act virtually purposeless, for the Court conceded that "i[t] did not require the act of October 6, 1917, to render the United States liable for the use of a patented device either under an express or implied contract." Id. at 522. Thus, "as a remedial statute the act of October 6, 1917, with respect to the creation of governmental liability arising *ex contractu* was in line with the then existing law and followed established precedents." Ibid.

An alternative interpretation of the Act is found in the later case of Martin v. United States, 84 Ct.Cl. 41, 51 (1936):

> "The War Act of October 6, 1917, was a remedial statute. It enlarged a patentee's right with respect to the date when infringement of the same began because of the exercise of emergency authority granted the Commissioner by Congress. For a stated period, Congress waived for the Government the right upon its part to escape liability for infringement of a citizen's patent until subsequent to the grant to him of a patent, and consented if liable to respond in damages as of and from the date of infringement and not the date of the patent."

Thus, whereas the earlier interpretation placed suits under the 1917 act within the pre-existing general jurisdiction of the Court of Claims over actions in contract against the Government, the Martin court viewed the Act as an extension of the court's jurisdiction to try tort claims against the Government for patent infringement under the predecessor of the present 28 U.S.C. § 1498 (an act of June 25, 1910, 36 Stat. 851, as amended by an act of July 1, 1918, 40 Stat. 705). The conflict between these two views had been highlighted by the holding of the Supreme Court in De Forest Radio, Telephone & Telegraph Co. v. United States, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927), that governmental use under an implied contract is a complete defense to an action against the United States for patent infringement under the predecessor of 28 U.S.C. § 1498.

When Congress modified the act of 1917 into its present form as the Invention Secrecy Act of 1951, 66 Stat. 4, former 35 U.S.C. §§ 151–159, it would appear to have resolved the dispute over congressional purpose. The requirement that the patent applicant voluntarily tender his invention for government use was abolished, and, in its place, the Commissioner of Patents now has the right to disclose the security-related invention to government defense agencies, which right, when exercised, deprives the inventor of sole power over the invention prior to the issuance of a patent. A limit of six years after the time that a patent is ultimately granted is imposed on the inventor's right to bring suit for compensation in the United States district courts. As this limit corresponds with the usual six year statute of limitations on suits for patent infringement, 35 U.S.C. § 286, this correlation suggests that claims for compensation for government use *after* the grant of a patent are to be brought, not under the Invention Secrecy Act, but under the ordinary infringement provisions of 28 U.S.C. § 1498 in the Court of Claims.

Also, most significantly, Congress wrote into the Invention Secrecy Act of 1951 the right of the United States to "avail itself of all defenses it may plead in an action under section 1498 of title 28." Inasmuch as § 1498 grants relief only for tortious or unauthorized government use, governmental use under an express or implied license is a complete defense to a proceeding brought under that section. De Forest Radio Telephone & Telegraph Co. v. United States, supra. Were this defense provision of 35 U.S.C. § 183 to stand alone, we might agree with the district court that the defenses to a suit for patent infringement by the Gov-

ernment—express or implied license, non-user, payment, and the rest—"are available to defeat a claim for compensation for use under the Invention Secrecy Act * * * but not to defeat the jurisdiction of the district court to adjudicate the claim." 175 F.Supp. 230, 248. But these provisions, when taken together with the other factors we have considered, make it too clear for doubt that Congress intended by the act to grant relief only for unauthorized use by the United States.

The following picture emerges, therefore. By enacting the Invention Secrecy Act of 1951, Congress sought to grant relief which was fully as broad as—but no broader than—the harm suffered by a patent applicant through the imposition of a secrecy order pursuant to § 181 of the Act. When, prior to the imposition of such an order, the owner of an invention voluntarily discloses it to the Government and consents to governmental use, any subsequent secrecy order is only incidental to his claim for compensation. His action, if any, is on an express or implied contract under 28 U.S.C. § 1491, and if his claim exceeds $10,000 his proper forum is the Court of Claims. 28 U.S.C. § 1346; United States v. Bethlehem Steel Co., 258 U.S. 321, 42 S.Ct. 334, 66 L.Ed. 639 (1922); Talbert v. United States, 25 Ct.Cl. 141 (1890), aff'd, 155 U.S. 45, 15 S.Ct. 4, 39 L.Ed. 64 (1894); Cygnet Manufacturing Co. v. United States, 60 Ct.Cl. 840 (1925). The statutory pattern indicates that when a patent holder seeks compensation for governmental use after the grant of a patent upon which secrecy orders were once imposed, his remedy, if any, lies in the Court of Claims under 28 U.S.C. § 1498; and that only unauthorized governmental use, prior to the grant of a patent and resulting from disclosure pursuant to § 181 of the Act is a harm attributable to

the Invention Secrecy Act for which no other provision of the patent laws grants relief. Cf. Robinson v. United States, 236 F.2d 24, 27 (2 Cir., 1956). Hence the district courts which are granted jurisdiction to entertain claims arising under the Invention Secrecy Act are not granted jurisdiction to adjudicate upon claims in excess of $10,000 arising from authorized governmental use. Any other interpretation of the Act renders it a jurisdictional grant of indefinite boundaries, turning upon the often incidental and happenstance issuance of secrecy orders.

Nothing we have said is inconsistent with our prior constructions of the Act in Robinson v. United States, supra, or Halpern v. United States, 258 F.2d 36 (2 Cir. 1958). In Halpern we said that the Act "evinces a strong concern that inventors be encouraged to discover inventions having military value and to submit them to the United States." Inventors would derive little encouragement, however, if the Act were construed to induce inventors to disclose their inventions to the Government without any indication that compensation was expected, relying solely on the hope that secrecy orders, the prerequisites to compensation, might some day be forthcoming. No prudent inventor would proceed in such a manner. Assuredly inventors must be encouraged to submit their discoveries to our defense agencies at the earliest possible moment. In doing so, however, their hope for fair compensation for the use of their inventions should not depend upon whether secrecy orders imposed in the interest of an overriding national security are subsequently issued, but should depend upon the law of the contract.[4]

Under the provisions of 28 U.S.C. § 1406(c) a United States District Court is empowered to transfer to the Court

---

4. [W]here the Government uses a patented invention with the consent and express permission of the owner, and does not "repudiate the title of such owner," an implied contract to pay a reasonable compensation for such usage rises.

United States v. Bethlehem Steel Co., 258 U.S. 321, 327, 42 S.Ct. 334, 336, 66 L.Ed. 639 (1922).

of Claims any case within the exclusive jurisdiction of the latter court which was pending in a district court on, or was brought after, September 13, 1960.

The judgment of the district court is reversed and the case remanded with instructions that it be transferred to the Court of Claims pursuant to 28 U.S.C. § 1406(c).

CLARK, Circuit Judge (dissenting).

This case would appear to fall precisely within the terms of 35 U.S.C. § 183 —quoted in note 1 of the opinion, supra —a broadly remedial statute which is the basis for district court jurisdiction here. My brothers reach a contrary result by interpolating into the statute a phrase which is not there and which is actually quite inappropriate. By that interpolation they would limit the operation of the statute to compensation for the *unauthorized* use by the government of a patent covered by a secrecy order. So compensation for authorized use of such a patent (found to be the situation here) may be obtained only entirely outside the statute by an action in the Court of Claims in ordinary course. I shall discuss below the inappropriateness of this gratuitous embellishment on a self-contained statute and consequent drastic limitation of its field of operation. But first I wish to point out its more natural operation as illustrated in this case under the sound interpretation of Chief Judge Ryan below, D.C.S.D.N.Y., 175 F.Supp. 230, Id., D.C., 197 F.Supp. 756.

That natural operation is simply to apply to the conceded facts of the case the statute as it is written. Under 35 U.S.C. § 183 what is to be settled by the process there set out of administrative award, followed by court action, if necessary in the Court of Claims or an appropriate district court, is compensation to the inventor for the use of the invention by the government "resulting from his disclosure." "Disclosure" is defined in 35 U.S. C. § 181—substantially quoted in note 2 of the opinion—and clearly means (as the opinion states) the disclosure of the invention initially by the inventor in his patent application, but then made secret by the secrecy order except as the Commissioner of Patents must make it available for inspection by the several defense agencies named in the statute. It is to be particularly noted that this limited, but crucial, disclosure is mandatory on the part of the Commissioner and flows automatically from the imposition of the secrecy order on the patent. There are no qualifications or limitations because of prior knowledge or contract negotiations or the like.

Here in my view is where my brothers have made a wrong turning. They apparently adopt a sort of man-in-the-street interpretation of disclosure as not being possible of something already known to the disclosee through prior negotiations. But this overlooks the statutory scheme making this a word of art and defining a mandatory act upon which the government's use of the secret invention must depend. Hence in the present case, which deals not with plaintiff's own sales to the government—admittedly it has been amply paid for those and that account closed—but with use of the invention, at government behest, for the additional bomb sights produced by the Eastman Kodak Company, the right to compensation rests wholly on the statutory disclosure. As the statute makes abundantly clear, the only disclosure which can be had once the secrecy order is entered is that which the statute defines; and prior negotiations, if any, are superseded by or merged in that disclosure. So here the Eastman bomb sights were actually produced under patent claim 4, which was claim 32 of the patent application. This was the exact stipulation of the parties before trial. Moreover, the government admitted use under this patent claim, and the court found accordingly. Farrand Optical Co. v. United States, D.C.S.D. N.Y., 175 F.Supp. 230, 233; Id., D.C., 197 F.Supp. 756, 758. This is the only basis upon which a legal claim for compensation can be made for government use of a patent covered by a secrecy order; and this stipulation, admission,

and finding, I submit, completely dispose of the jurisdictional issue.

Now the phrase given the heavy burden of upsetting this natural result by my brothers, "unauthorized use by the government," would seem inept in any event. We know what a rich bonanza defense work is to business corporations, great and small; "unauthorized" can at most refer only to those few concerns which have not yet had defense opportunities and the chance to negotiate therefor. So to restrict § 183 in this fashion is to leave to that statute a decidedly limited field of operation in practice. But actually the phrase cannot be appropriate at all, for § 183 makes all such governmental use authorized, once the wheels are set in motion by the inventor's voluntary disclosure of a defense invention in his patent application, followed by the secrecy order. Actually what my brothers undoubtedly mean is an invention disclosed to the government by negotiation or contract before ever the secrecy order is entered. As thus redefined, the problem acquires understandable form; but the difficulties of the interpretation also become obvious. For the troublesome question arises how much by way of negotiation or contract is necessary to oust the statute of operation. Thus it is to be noted that in Halpern v. United States, 2 Cir., 258 F.2d 36, 37, the inventor "approached the Office of Scientific and Research Development and explained the scientific principles of his invention." The actual contract for exploitation was then made with the Radiation Laboratory of the Massachusetts Institute of Technology. Nevertheless, contrary to the result here, we upheld the district court's jurisdiction.

While this plaintiff did have a contract with the government, it is difficult to see how that can function to exclude the operation of § 183 if the negotiations in the Halpern case did not do so. As the court found, the plaintiff's royalty-free license to the government expired on March 2, 1946—long before the secrecy order of February 23, 1949, and the deliveries of bomb sights to the government by both plaintiff and Eastman, which occurred from 1950 to 1960. D.C. S.D.N.Y., 175 F.Supp. at page 238; Id., D.C., 197 F.Supp. at pages 765–768, 771–772. Moreover, the contract does not cover the matter here crucial, namely, the use of the patent as disclosed by the government to a third party, to wit, Eastman, and the proper compensation for such use. It seems wholly obvious that to solve the issues now actually before us resort can be had only to the provisions of the Invention Secrecy Act, and there is nothing in the contract to supply the gap.* Hence the premise upon which my brothers build their case is entirely inadequate, while the simpler interpretation of the statute employed below gives a complete justification for the district court's holding.

Thus, as I have already indicated, the decision herein seems to me contrary in substantial point to our holding in Halpern v. United States, supra, 2 Cir., 258 F.2d 36. It also sets at naught the policy stressed in Congressional debates and emphasized in the Halpern case and the earlier case of Robinson v. United States, 2 Cir., 236 F.2d 24, of affording inventors the incentive of not merely the administrative remedy and delayed period of limitation of the statute, but also the presence of a court close at hand for redress if court action becomes necessary. I can see no functional reason for the distinction in available remedy now developed by my brothers. Every argument for district court review in the case where there has been no prior negotiation would seem to apply perhaps even more strongly where there has been some

---

* The government made a special attack upon the jurisdiction of the court to adjudicate compensation for the bomb sights delivered by Eastman after the lifting of the secrecy order on December 2, 1954, and until institution of action in 1960. But if the statutory analysis here presented is correct, all these deliveries resulted from and were made possible by the disclosure pursuant to 35 U.S.C. § 181.

negotiation, followed by a present dispute. Only stern compulsion of the statute should force the distinction upon us. And yet the statute itself does not even hint at the distinction, but from its background and language strongly persuades to the absence of distinction. One can only suggest again that judicial rewriting of Congressional acts is an activity indeed fraught with peril.

Other considerations adverted to in the opinion as makeweights for the conclusion seem to me in the main to cut the other way. Admittedly the legislative history gives no decisive support for my brothers' holding. But the change in the 1951 act, omitting the requirement of a voluntary tender of his invention by the patent applicant and substituting the present mandatory features of the law, far from making the Congressional purpose in favor of my brothers' conclusion "too clear for doubt," surely does quite the contrary. For the mandatory features of the present statute are the basis for my view that this is a controlling governmental mandate based fundamentally on the government's sovereign power of eminent domain to take whatever it may need for public safety and defense. And the special provisions giving a six-year period of limitation *after* the procedures for administrative award have been completed show how different this is from the ordinary patent infringement claim. I venture to say that had a patent owner sought compensation for either negotiated or unnegotiated use within the period allowed by § 181, but after an ordinary infringement suit was barred, we would indeed hesitate to say that his remedy was gone in one case, though not in the other.

While our discussion is necessarily directed to the issue of jurisdiction before us, the problem may have more extensive ramifications. The Invention Secrecy Act is broadly worded in terms of its coverage and gives the government means to make extensive use in times of peril of new defense inventions, of course making adequate payments to the inventors. Does my brothers' argument mean that nevertheless inventors by contract may place serious restrictions upon the future use of their inventions by their government which will control beyond the terms of the extensive statutory grant? Perhaps the moral for both the government and the inventor is that neither should indulge in negotiations as to potential defense inventions, for both will retain more freedom for effective action if they deal with each other only at arm's length! These are some of the problems which a strained and unnatural construction of the statutes is piling up for our future harassment. They also suggest the need for a quite different attack on the problem of statutory interpretation.

It is unfortunate that the herculean labors of the parties and the judge to bring this case to completion, as disclosed particularly in Judge Ryan's second opinion, D.C.S.D.N.Y., 197 F.Supp. 756, are now to be thrown into the discard because of this adverse resolution of the preliminary issue of jurisdiction. It would have seemed to me better judicial economy, in case a doubt was thought to exist, to have resolved all presumptions in favor of jurisdiction. But in view of the turn the case has now taken, it would be futile for me to discuss the issues on the merits, and I shall refrain from doing so. I content myself with recording my vote in favor of upholding the jurisdiction of the district court.

Before CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

On Rehearing by Court in Banc.

PER CURIAM.

 After a majority of the original panel which heard this case had held that the district court was without jurisdiction a petition was filed seeking to have this issue reheard in banc. A majority of the active judges voted to grant the petition. The rehearing, limited solely to the question whether the district court properly took jurisdiction

of the case, was had on oral arguments and briefs on January 16, 1963, with all the active judges participating except Chief Judge Lumbard, who was disqualified because of a previous connection with the case during his service as United States Attorney. The decision of the district court below upholding its jurisdiction, D.C.S.D.N.Y., 175 F.Supp. 230, 248, 197 F.Supp. 756, 758, is affirmed as to that issue by an equally divided court, Judges Clark, Friendly, Smith, and Marshall voting for such affirmance, and Judges Waterman, Moore, Kaufman, and Hays voting to reverse and remand for transfer of the action to the United States Court of Claims. See Drake Bakeries Incorporated v. Local 50, American Bakery & Confectionery Workers International, AFL-CIO, 2 Cir., 294 F.2d 399, 400, affirmed 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474.

■ The appeal is retained on our appellate docket for further proceedings by the original panel in order that it may now consider the issues on appeal not previously reached.

WATERMAN, Circuit Judge (dissenting).

I dissent from the court's order that reinstates the original displaced panel and directs that the issues in this case not previously reached by that panel be determined by it.

Section 46(c) of Title 28 of the U.S. Code reads as follows:

"§ 46. Assignment of judges; divisions; hearings; quorum

 * * * * *

"(c) Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in active service. A court in banc shall consist of all active circuit judges of the circuit."

It is obvious that when a court of appeals in any case determined by a panel grants a rehearing of the case before the court sitting in banc, the full bench of its judges supplants the panel, i. e., "court or division" of three judges, that first heard and determined the controversy. So I agree with my colleagues that an in banc court does not sit as an appellate court of review over its own panels. If such were so, the result reached here by the panel would not have been disturbed.

However, it seems equally obvious to me that the in banc court having supplanted the panel, the "unless" clause in 28 U.S.C. § 46(c) commands that the in banc court hear and determine all the undetermined issues remaining undisposed of in this controversy. No language in the statutes dealing with Courts of Appeals, 28 U.S.C. §§ 41–48, and no precedent, can be found that justifies an in banc court that has partially heard a case ordering a remand, or a reference, of that case to a displaced panel in order for that panel to determine issues the in banc court did not wish to determine.

I would order that the eight judges who have displaced the original panel carry the case forward and determine the undetermined issues. Only by so doing will subsequent proceedings in this controversy be secure from a challenge that they are being conducted by an unauthorized tribunal.